UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X          **Docket No.:**

ALISON MIDSTOKKE,

*Plaintiff,*

**COMPLAINT**

-against-

DELOITTE & TOUCHE, LLP., JESSE M.                    **PLAINTIFF DEMANDS**
MOTHERSHED, *In His Individual and Official*              **A TRIAL BY JURY**
*Capacities* and ALEXIS FOX, *In Her Individual*
*And Official Capacities,*

*Defendants.*
---------------------------------------------------------------X

PLANTIFF, ALISON MIDSTOKKE, by her attorneys, PHILLIPS & ASSOCIATES,

ATTORNEYS AT LAW, PLLC, hereby complains of the Defendant(s), upon information and

belief, as follows:

### NATURE OF THE CASE

1.      PLAINTIFF brings this action alleging that DEFENDANTS violated the Americans with

Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. ("ADA"); the New York State Human

Rights Law, New York State Executive Law § 296, *et seq.* ("NYSHRL"); and the New

York City Human Rights Law, New York City Administrative Code § 8-502(a), *et seq.*

("NYCHRL"). PLAINTIFF seeks damages to redress the injuries PLAINTIFF suffered as

a result of being discriminated and retaliated against on the basis of her **disability and/or**

**perceived disability, as well as her gender/sex**. PLAINTIFF also asserts that she was

retaliated against and terminated by DELOITTE & TOUCHE due to her disability, for

requesting a reasonable accommodation and for opposing discriminatory practices.

2.      At all times relevant to the Complaint, PLAINTIFF ALISON MIDSTOKKE was employed

at/with DELOITTE & TOUCHE as a Senior Business Center Assistant.

3.      PLAINTIFF suffers from a disability known as Treacher Collins Syndrome ("TCS"). As a result of this disability, PLAINTIFF has a hearing impairment that requires her to use a hearing aid. Indeed, as a result of her disability, PLAINTIFF wears a cochlear implant on her right ear, which is a bone-anchored hearing aid.

4.      During the course of her employment at DELOITTE, PLAINTIFF was harassed, insulted, verbally abused, dismissed and unwelcomed due to her disability by her manager DEFENDANT JESSE MOTHERSHED.

5.      PLAINTIFF'S coworkers and teammates began to subject PLAINTIFF to the same type of hostile work environment because they did not want to accommodate PLAINTIFF and/or were clearly annoyed by PLAINTIFF and her disabilities.

6.      PLAINTIFF repeatedly reported her concerns to DEFENDANT MOTHERSHED, who took no action to resolve the hostile work environment, while actively adding to and facilitating the hostility against PLAINTIFF. Indeed, DEFENDANT MOTHERSHED explicitly told PLAINTIFF that "***this is not going to work***" when the batteries in her hearing aid died. DEFENDANT MOTHERSHED also specifically said, "***we do not have to accommodate you***" when PLAINTIFF advised him of her rights under the ADA. On multiple occasions, PLAINTIFF was yelled at and told that she "***needs to listen***" by DEFENDANT MOTHERSHED and her coworkers.

7.      PLAINTIFF complained to DEFENDANT ALEXIS FOX, HR Representative, about DEFENDANT MOTHERSHED and her coworkers to Human Resources at DELOITTE, but DEFENDANT FOX took no action to assist PLAINTIFF and instead allowed DEFENDANT MOTHERSHED to amplify his abuse against PLAINTIFF.

8.      As a result of her complaints, the hostile work environment against PLAINTIFF increased under DEFENDANT MOTHERSHED. DEFENDANT MOTHERSHED began to make-

up reasons to reprimand, write up and discipline PLAINTIFF until PLAINTIFF was wrongfully terminated in retaliation for her multiple complaints.

## JURISDICTION AND VENUE

9.  Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. §§ 1331 and 1343.

10. The Court has supplemental jurisdiction over PLAINTIFF'S claims brought under state and city law pursuant to 28 U.S.C. § 1367.

11. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), as the acts complained of occurred therein.

## PROCEDURAL PREREQUISITES

12. Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

13. Plaintiff received a Notice of Right to Sue from the EEOC, dated April 9, 2019, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto.

14. This Action is being commenced within ninety (90) days of receipt of said Right to Sue.

## PARTIES

15. **PLAINTIFF ALISON MIDSTOKKE (hereinafter, "PLAINTIFF")** is a 33-year-old female. PLAINTIFF began working for Defendant DELOITTE & TOUCHE as a Senior Business Center Assistant on or about October 30, 2017, earning a salary of approximately $65,000 per year, plus benefits.

16. **PLAINTIFF** was born with a condition known as Treacher Collins Syndrome ("TCS"). TCS is a genetic disorder characterized by deformities of the face. The degree to which a person is affected, however, may vary from mild to severe. Complications caused by TCS may include breathing problems, problems seeing, hearing loss, etc. As a youth,

PLAINTIFF spent months in hospital having reconstructive surgery on her face, as well as to correct her speech and hearing. As PLAINTIFF was born without ears, part of her surgeries included reconstructive surgery to give PLAINTIFF ears. Nevertheless, PLAINTIFF still suffers from a hearing impairment (disability at issue) in the present day, which requires PLAINTIFF to use a hearing aid. Indeed, as a result of her disability, PLAINTIFF wears a cochlear implant on her right ear, which is a bone-anchored hearing aid.

17.     **PLAINTIFF** is also an avid public advocate for the rights of persons with disabilities. In this regard, PLAINTIFF engages in public speaking to educate the public with regard to disability issues. PLAINTIFF is also an actress, model and artist. PLAINTIFF also has appeared on multiple news broadcasts to bring awareness and to discuss issues concerning people with disabilities.

18.     **DEFENDANT DELOITTE & TOUCHE, LLP. (hereinafter "DELOITTE")**, is a domestic business corporation existing under the laws of the State of Delaware. "DELOITTE" provides audit and assurance assistance, consulting, risk and financial advisory services, risk management services, tax services, and related services to its clients. The DELOITTE location at issue in this Complaint is located at 30 Rockefeller Plaza, New York, NY.

19.     **DEFENDANT JESSE M. MOTHERSHED (hereinafter "DEFENDANT MOTHERSHED")** is/was the Manager of Administrative Services at DELOITTE. At all times relevant, DEFENDANT MOTHERSHED was PLAINTIFF'S manager and supervisor and had the ability to affect the terms and conditions of PLAINTIFF'S employment. DEFENDANT MOTHERSHED is being sued in his individual and official capacities.

20.     **DEFENDANT ALEXIS FOX (hereinafter "DEFENDANT FOX")** was employed in Deloitte's Human Resources Department and was an individual to which PLAINTIFF complained and reported her discrimination/retaliation issues on multiple occassions. DEFENDANT FOX had the ability to affect the terms and conditions of PLAINTIFF'S employment. DEFENDANT FOX is being sued herein in her individual and official capacities.

## MATERIAL FACTS

21.     PLAINTIFF began her employment at DELIOTTE as a Senior Business Center Assistant on or about 10/30/2017.

22.     PLAINTIFF was hired from a career fair for people with disabilities. As such, from the outset, before PLAINTIFF accepted employment at DELOITTE, DEFENDANTS were aware of PLAINTIFF'S disabilities and her need for a reasonable accommodation.

23.     PLAINTIFF was a satisfactory performing employee and was qualified to perform the duties of her employment with a reasonable accommodation.

24.     However, shortly after beginning her employment at DEFENDANT DELOITTE, PLAINTIFF started to experience ongoing and continuous harassment, discrimination and retaliation by her manager, DEFENDANT MOTHERSHED and the members of her team.

25.     In January 2018, the battery in PLAINTIFF'S hearing aid died and PLAINTIFF temporarily lost her ability to hear as a result. Though PLAINTIFF usually carries spare hearing aid batteries with her, on this day, PLAINTIFF did not have her spare hearing aid.

26.     As a result, PLAINTIFF quickly changed the batteries in her hearing aid. However, during this time, PLAINTIFF had difficulty hearing.

27.     PLAINTIFF asked DEFENDANT MOTHERSHED, as well as her coworkers, for a reasonable accommodation and asked for a few minutes before communicating so that she

could change her batteries.

28.   In response, DEFENDANT MOTHERSHED showed that he was annoyed by PLAINTIFF and her request.

29.   Specifically, DEFENDANT MOTHERSHED exclaimed, "***Oh God, this is going to be a problem! This is not going to work.***"

30.   PLAINTIFF was embarrassed and humiliated by DEFENDANT MOTHERSHED'S discriminatory reaction to PLAINTIFF'S reasonable request.

31.   At this time, PLAINTIFF politely reminded DEFENDANT MOTHERSHED that she had a disability and asked DEFENDANT MOTHERSHED to accommodate same.

32.   Callously, DEFENDANT MOTHERSHED tersely responded, "***we do not have to accommodate you***," among other things, and continued to embarrass and berate PLAINTIFF due to her disability.

33.   Upset, PLAINTIFF went to Human Resources and complained about DEFENDANT MOTHERSHED'S discriminatory comments and behavior (**Plaintiff's first complaint**).

34.   Upon information and belief, no action was taken against DEFENDANT MOTHERSHED following PLAINTIFF'S first complaint and the discriminatory environment against PLAINTIFF continued and escalated.

35.   DEFENDANT MOTHERSHED learned of PLAINTIFF'S complaint to Human Resources an began to retaliate against PLAINTIFF and/or subject PLAINTIFF to an ongoing hostile work environment.

36.   Among other things, DEFENDANT MOTHERSHED continued to harass PLAINTIFF about her hearing.

37.   On several occasions, DEFENDANT MOTHERSHED would yell, "***you have to listen!***" at PLAINTIFF in front of her coworkers in an effort to embarrass PLAINTIFF.

38.    In addition, PLAINTIFF'S coworkers under the direction and control of DEFENDANT MOTHERSHED began to make the same kinds of comments about PLAINTIFF'S hearing and/or hearing impairment as well.

39.    Despite knowing that said actions were unlawful, DEFENDANT MOTHERSHED actively participated in, and refused/failed to prevent and/or correct, the discriminatory and retaliatory hostile work environment against PLAINTIFF.

40.    In addition, DEFENDANT MOTHERSHED continued to berate PLAINTIFF because she could not wear a headset device like the rest of her teammates.

41.    PLAINTIFF explained that the headset device interfered with her hearing aid and was very difficult to wear given her disabilities.

42.    After DEFENDANT MOTHERSHED appeared unmoved by PLAINTIFF'S explanation and continued to order her to wear same, PLAINTIFF was compelled to further explain her circumstances to DEFENDANT MOTHERSHED.

43.    Specifically, explained that she could not "*wear a hearing aid on her right ear, because she was born without ears, which is part of her syndrome*" (TCS) and that this "*is also why [she] am not able to wear a headset*."

44.    PLAINTIFF was caused to be distressed by this discussion because she is sensitive with regard to her disability and history related thereto. As such, it was not easy and was humiliating for PLAINTIFF to explain her medical history to DEFENDANT MOTHERSHED.

45.    DEFENDANT MOTHERSHED remained unmoved by PLAINTIFF'S explanation and insisted that PLAINTIFF wear the headset device despite her request for an accommodation.

46.    However, PLAINTIFF noticed that several other coworkers and teammates, who did not

suffer from disabilities such as PLAINTIFF, did not wear headsets and DEFENDANT MOTHERSHED did not raise issue with those other employees.

47.    Again, PLAINTIFF went to Human Resources and complained about DEFENDANT MOTHERSHED'S comments and actions, as well as the hostile environment to which she was being subjected **(Plaintiff's second complaint).**

48.    Upon information and belief, again, no action was taken against DEFENDANT MOTHERSHED and the discriminatory insults, ridicule, berating, humiliation and retaliatory hostile work environment continued against PLAINTIFF.

49.    Now, among other things, DEFENDANT MOTHERSHED began to criticize PLAINTIFF'S performance, her communication with her coworkers, as well as PLAINTIFF'S clothing - in retaliation for complaining twice about his conduct to HR.

50.    On multiple occasions, DEFENDANT MOTHERSHED berated PLAINTIFF for allegedly wearing "provocative" clothing.

51.    However, PLAINTIFF <u>did not</u> dress in an inappropriate manner to report to work and viewed DEFENDANT MOTHERSHED'S criticisms and being in furtherance of his retaliation.

52.    Indeed, PLAINTIFF noted that her coworkers, who did not suffer from disabilities and/or did not lodge complaints against DEFENDANT MOTHERSHED, routinely wore provocative and fitted clothing, short skirts and other clothing that was (arguably) inappropriate in the workplace.

53.    But these other employees were not berated, scrutinized or told to dress differently as was PLAINTIFF.

54.    Due to the constant unreasonable criticisms about her manner of dress, PLAINTIFF felt compelled to take daily pictures and record of her outfits - including the outfits with which

DEFENDANT MOTHERSHED raised-issue.

55. Feeling further harassed, once again, PLAINTIFF complained to Human Resources about the conduct of DEFENDANT MOTHERSHED, as well as her coworkers **(Plaintiff's third complaint)**.

56. Specifically, on or about March 2, 2018, PLAINTIFF had a meeting with DEFENDANT ALEXIS FOX (Deloitte Talent/Human Resources) on March 2nd 2018 at 3:30 pm.

57. During this meeting, PLAINTIFF discussed her concerns regarding her disabilities and the hostile treatment she was receiving under DEFENDANT MOTHERSHED.

58. Specifically, PLAINTIFF explained her disability, which is her hearing impairment, as well as her struggle with speech due to her condition (TCS).

59. PLAINTIFF explained that she advised DEFENDANT MOTHERSHED about her disabilities and need for accommodations several times and that DEFENDANT MOTHERSHED stated outright that he was not willing to accommodate PLAINTIFF.

60. PLAINTIFF complained about DEFENDANT MOTHERSHED'S negative attitude and about how his behavior was creating an unwelcoming hostile work environment for PLAINTIFF.

61. PLAINTIFF explained about how MOTHERSHED began to unfairly criticize everything from the way she dressed to the way she spoke, including her tone.

62. PLAINTIFF often spoke in a louder tone, which is common among people with hearing impairments. This was an unintended habit that came with her disabilities.

63. PLAINTIFF further explained that the way she spoke was part of her disability and that she has been watching her tone as a result of DEFENDANT MOTHERSHED'S constant harassment.

64. DEFENDANT FOX claimed to understand and advised PLAINTIFF that they would look

into the matter and that they would schedule another meeting on March 6th 2018.

65. **PLAINTIFF spoke with DEFENDANT FOX again on March 6th, 14th, 21st, 26th and 27th.**

66. PLAINTIFF was told that DEFENDANT FOX would contact DEFENDANT MOTHERSHED to discuss PLAINTIFF'S medical accommodation.

67. PLAINTIFF learned during her discussion with DEFENDANT FOX that DEFENDANT MOTHERSHED said that PLAINTIFF "*was not a good member*" for his team, which he had been building for a year prior.

68. DEFENDANT MOTHERSHED thought that the makeup of his team was more important than providing an accommodation to PLAINTIFF and that PLAINTIFF did not make a good team member because her disabilities, and her requests for accommodations, were inconvenient for DEFENDANT MOTHERSHED and his team.

69. As a result of DEFENDANT MOTHERSHED'S continued animus toward PLAINTIFF, PLAINTIFF felt that she was being isolated and excluded from her group.

70. Indeed, PLAINTIFF learned that her team was keeping her out of team discussions and excluding her from team meetings regarding issues that were important to the team.

71. In addition, DEFENDANT MOTHERSHED continued to talk-down to PLAINTIFF and treated PLAINTIFF like an outcast among the group.

72. On 4/18/2018, DEFENDANT MOTHERSHED, again, yelled at PLAINTIFF about her hearing and stated that PLAINTIFF "*needs to listen*" to her teammates' discussions - in an abusive and condescending manner.

73. PLAINTIFF explained, again, to DEFENDANT MOTHERSHED that it was difficult to listen to multiple conversations at once due to her hearing impairment.

74. Because PLAINTIFF relies on a hearing aid, PLAINTIFF can usually only hear one voice at a time and it is difficult to discern background noise from other sound because all noise comes through PLAINTIFF'S hearing aid at the same volume.

75. PLAINTIFF further explained that she cannot hear every word during conversations when there are other noises in the background or if the person speaking is 10-15 feet away.

76. PLAINTIFF also protested the fact that she was the only person in the group being singled-out and excluded from group meetings/discussions due to her disability.

77. DEFENDANT MOTHERSHED offered no solution or response to PLAINTIFF'S complaints.

78. DEFENDANT DELOITTE purports to have a "zero tolerance" antidiscrimination policy, which forbids discrimination against individuals with disabilities, such as PLAINTIFF herein.

79. As a manager, DEFENDANT MOTHERSHED knew or should have known of DELOITTE'S antidiscrimination policies and MOTHERSHED was also charged with the responsibility to receive and act once an employee makes a complaint of discrimination.

80. DEFENDANT MOTHERSHED intentionally ignored DELOITTE'S antidiscrimination policies - to the detriment of PLAINTIFF.

81. All of PLAINTIFF'S complaints to DEFENDANTS were futile.

82. In the alternative, DEFENDANT DELOITTE did not train, properly instruct or supervise DEFENDANT MOTHERSHED with regard to his obligations as a manager under DELOITTE'S discrimination policies and/or under Federal, State and City laws.

83. To DEFENDANT MOTHERSHED, PLAINTIFF and/or PLAINTIFF'S disability were nuisances to DEFENDANT MOTHERSHED and DEFENDANT MOTHERSHED'S team.

84.   PLAINTIFF began to notice that other female employees and coworkers, who did not suffer from disabilities such as PLAINTIFF, were wearing clothing that was more provocative than anything that PLAINTIFF ever wore to work.

85.   Specifically, this other female employee (Erica Mercado) routinely wore short and tight-fitting outfits to work.

86.   PLAINTIFF specifically paid attention to the manner in which DEFENDANT MOTHERSHED responded to Ms. Mercado's clothing, to see if he would reprimand her for her provocative outfit.

87.   DEFENDANT MOTHERSHED did nothing in response to Ms. Mercado's outfit and did not even mention same - unlike similarly-situated PLAINTIFF.

88.   On or about 4/27/18, PLAINTIFF confronted DEFENDANT MOTHERSHED after seeing Ms. Mercado wearing a mini skirt to the office.

89.   Specifically, PLAINTIFF pointed out the provocative clothing that Ms. Mercado wore, referenced the dress-code and asked, "*is that appropriate?*"

90.   In response, DEFENDANT MOTHERSHED misrepresented that PLAINTIFF'S dress was shorter (which was outrightly false) and also falsely told PLAINTIFF that he confronted PLAINTIFF about her dress because, allegedly, "*someone commented*" about PLAINTIFF'S dress.

91.   DEFENDANT MOTHERSHED also stated that he chose to speak to PLAINTIFF, rather than her coworkers, because PLAINTIFF "***has a nice body***."

92.   PLAINTIFF was appalled by DEFENDANT MOTHERSHED'S discriminatory, sexist and/or sexually harassive comment about her figure and body.

93.   As such, not only did DEFENDANT MOTHERSHED admit to treating PLAINTIFF differently than her similarly-situated coworkers, DEFENDANT MOTHERSHED also

admitted that he <u>selectively enforced the dress code</u> to the detriment of PLAINTIFF alone.

94.     When PLAINTIFF responded that Ms. Mercado seemed to routinely wear "provocative" clothing to work, DEFENDANT MOTHERSHED responded, "***well, maybe no one notices her because people are not saying anything about her attire.***"

95.     Again, DEFENDANT MOTHERSHED admitted to singling-out PLAINTIFF for disciplinary action unlike her similarly-situated not-disabled coworkers.

96.     DEFENDANT MOTHERSHED did not uniformly enforce the rules among the members of his team.

97.     PLAINTIFF complained to DEFENDANT MOTHERSHED, again, that she felt "*targeted*" and "*singled-out*."

98.     In response, DEFENDANT MOTHERSHED got visibly angry, jumped in his seat, raised his voice and began yelling at PLAINTIFF for making a complaint.

99.     DEFENDANT MOTHERSHED did not forward PLAINTIFF'S concerns to Human Resources for evaluation or investigation as per his duties and obligations.

100.    Instead, DEFENDANT MOTHERSHED immediately attacked PLAINTIFF in an effort to intimidate, humiliate and ridicule PLAINTIFF further.

101.    On or about 5/18/18 DEFENDANT MOTHERSHED called PLAINTIFF in to his office and wanted to discuss her medical accommodation.

102.    Indeed, DEFENDANT MOTHERSHED then announced PLAINTIFF'S disabilities publicly and had open discussions with the team about PLAINTIFF'S disabilities and about communicating with PLAINTIFF.

103.    DEFENDANT MOTHERSHED'S tactic was humiliating and embarrassing to PLAINTIFF.

104. On 5/24/18, following this above-mentioned team-meeting about PLAINTIFF'S disabilities, PLAINTIFF experienced more hostility due to her disabilities from members of her team (namely, "Emily").

105. PLAINTIFF'S coworkers/team members, as well as DEFENDANT MOTHERSHED, were not pleased and were visibly annoyed with having to accommodate PLAINTIFF.

106. On this day (5/24/2018), PLAINTIFF'S coworker, "Emily," got upset and made offensive comments to PLAINTIFF about how PLAINTIFF "*does not listen*."

107. The criticism that PLAINTIFF "*did not listen*" and/or "*needs to listen*" were words most-often used by DEFENDANT MOTHERSHED and PLAINTIFF'S coworkers to humiliate PLAINTIFF due to her disabilities.

108. In response, PLAINTIFF politely stated, "*I am sorry I didn't hear you,*" to which Emily angrily responded, among other things, "*you were able to hear other conversations that were going on - get it together!*"

109. Clearly, Emily intended to further humiliate PLAINTIFF due to her disabilities.

110. During the team meeting from 5/18/18, PLAINTIFF discussed the fact that her hearing and communication would be better if she could see the person to which she was talking.

111. On 5/24/2018, during another discussion with her coworker Emily, Emily became visibly and verbally annoyed with PLAINTIFF again because PLAINTIFF looked away from Emily during a discussion so that PLAINTIFF could retrieve a file that the two were discussing at the time.

112. Unreasonably, Emily began to berate PLAINTIFF for briefly looking away to retrieve the file.

113. PLAINTIFF was humiliated and made to feel as though her coworkers, teammates and managers were annoyed with her due to her disabilities.

114. Also, on 5/24/18, at around 11 am, PLAINTIFF accessed a skype training session offered by DELOITTE from her computer at her desk. Plaintiff's coworkers and teammates engaged in this same practice all the time and PLAINTIFF did not think it was issue.

115. Initially, the speakers on PLAINTIFF'S computer were turned up and PLAINTIFF soon noticed that the speakers were loud.

116. As PLAINTIFF was turning down the volume on the speakers, PLAINTIFF'S coworker and teammate, Ericka Mercado, aggressively approached PLAINTIFF and exclaimed, annoyingly, "*didn't you hear me call you several times? Can you please turn down the volume*!"

117. PLAINTIFF turned down the volume, apologized, stated that she was sorry, stated that she did not hear Erica and then PLAINTIFF reminded Erica that she is hearing impaired.

118. In response and visibly annoyed, Erica persisted and asked, "*well you were able to hear a conversation a while ago and you couldn't hear me calling you*?"

119. PLAINTIFF was forced to explain that the speaker was on and that PLAINTIFF did not hear Erica right away. PLAINTIFF also explained (again) that when there is background noise, PLAINTIFF cannot always hear the people talking to her or other conversations happening around PLAINTIFF.

120. Erica then asked PLAINTIFF why PLAINTIFF could not wear a headset to listen to the skype lesson.

121. PLAINTIFF, feeling uncomfortable by Erica's annoyed and insensitive attitude, then explained, <u>again</u>, that she could not use headsets because of her hearing impairment.

122. PLAINTIFF had this same conversation with Erica on two different occasions wherein she asked Erica to come in front of PLAINTIFF, knock on PLAINTIFF'S desk, ask another

colleague to get PLAINTIFF'S attention or to lightly tap on PLAINTIFF'S shoulder to get PLAINTIFF'S attention.

123. On many occasions, PLAINTIFF'S team and coworkers seemed to treat PLAINTIFF harshly and/or cause PLAINTIFF to feel unwelcomed.

124. On multiple occasions, other coworkers had to step-in on PLAINTIFF'S behalf to ask Ericka to stop harassing PLAINTIFF, while Erica refused to do so.

125. As a result of Erica's harassment of PLAINTIFF due to her disabilities, PLAINTIFF was caused to go to the bathroom and cry on this day.

126. On this same day 5/24/2018, PLAINTIFF complained to DEFENDANT MOTHERSHED about the actions of her coworker Erica and about how Erica's conduct was not accommodating and/or made PLAINTIFF feel uncomfortable in the workplace.

127. In response, DEFENDANT MOTHERSHED reprimanded PLAINTIFF and told PLAINTIFF that it is a corporate environment and that PLAINTIFF was the one that needed to be "*more professional*."

128. DEFENDANT MOTHERSHED did not subject the employee Erica to the same reprimand.

129. Instead, DEFENDANT MOTHERSHED told PLAINTIFF to be understanding of her coworkers' abusive actions because PLAINTIFF'S "*hearing disability is very complex to them*."

130. DEFENDANT MOTHERSHED asked PLAINTIFF to accommodate her coworkers' hostility because they were not used to dealing with people with PLAINTIFF'S disabilities - instead of telling PLAINTIFF'S coworkers to accommodate PLAINTIFF, who had the disabilities.

131. PLAINTIFF explained that she was having difficulty and that she continues to explain her disabilities over and over to her coworkers and team.

132. When PLAINTIFF asked DEFENDANT MOTHERSHED for help explaining her disabilities and accommodations to her coworkers, DEFENDANT MOTHERSHED replied, "*they are very confused [about your disability and accommodations]*" and asked "*what am I supposed to do?*"

133. DEFENDANT MOTHERSHED then told PLAINTIFF that she did not "*handle stress well,*" that "*he [was] not sure what the next step is*" and that "*we both need to call [Human Resources] to set up a time to talk together and to make sure we are on the same page.*"

134. Clearly, as a manger, who received multiple complaints from his subordinate (Plaintiff) concerning disability discrimination and hostile work environment issues, DEFENDANT MOTHERSHED either did not want to help PLAINTIFF and/or was not trained by DELOITTE to address discrimination complaints in the workplace.

135. On 5/25/18 PLAINTIFF brought her concerns and complained about the hostile environment to DEFENDANT FOX in Human Resources.

136. Upon information and belief, nothing was done by DEFENDANT FOX or Human Resources about PLAINTIFF'S complaints.

137. Instead, PLAINTIFF was told by DEFENDANT FOX that PLAINTIFF was the one that needed to act differently.

138. As such, DEFENDANT FOX, DELIOTTE'S Human Resources, condoned, supported the discriminatory and retaliatory actions of DEFENDANT MOTHERSHED and allowed said conduct to continue unabated - to the detriment of PLAINTIFF.

139. PLAINTIFF'S complaints to DEFENDANT FOX were all futile.

140. On June 7, 2018, PLAINTIFF asked another one of her coworkers, Emily Sonipersaud, a question regarding work procedures and whether Emily had instructions to upload contacts for mass mailings. PLAINTIFF asked Emily because she knew that Emily trained another

employee (Jude Okure) in the same procedure.

141.    However, unlike Jude Okure, Emily became annoyed and snapped at PLAINTIFF for asking for assistance and training.

142.    As a result of this situation, combined with all of the other hostile situations that PLAINTIFF had to endure at DELIOTTE, PLAINTIFF cried during her lunch hour.

143.    PLAINTIFF met with DEFENDANT MOTHERSHED for an hour wherein she explained and discussed the situation. PLAINTIFF was visibly frustrated by the interaction.

144.    However, DEFENDANT MOTHERSHED did nothing to address and/or alleviate PLAINTIFF'S concerns and the hostile work environment against PLAINTIFF continued.

145.    On or about June 14, 2018, PLAINTIFF was called into DEFENDANT MOTHERSHED'S office and DEFENDANT MOTHERSHED began to talk to PLAINTIFF about her manner of dress.

146.    DEFENDANT MOTHERSHED told PLAINTIFF that what she wore on Tuesday June 12th (a black cardigan, a black cami and red dress pants), as well as what she was wearing on this day, was "*productive*."

147.    DEFENDANT MOTHERSHED did not have the same discussions with the other (non-disabled) employees in PLAINTIFF'S team.

148.    Instead, PLAINTIFF was singled-out for this type of meeting and critique about her clothing.

149.    Among other things, DEFENDANT MOTHERSHED told PLAINTIFF to not "*wear something that you would wear to a club or anything that is form fitting*."

150.    PLAINTIFF asked DEFENDANT MOTHERSHED to explain what "form-fitting" means and DEFENDANT MOTHERSHED replied, "*as if something were painted on you*."

151.  PLAINTIFF, again, reiterated to DEFENDANT MOTHERSHED that she dresses appropriate and consistent with the dress code every day, while other female employees on her team wore short, tight and/or form-fitting clothing without issue from DEFENDANT MOTHERSHED.

152.  PLAINTIFF noted that her coworkers, Ericka, Emily, and Tania (who were not disabled like Plaintiff) have all wore very short and tight-fitting dresses with high heels routinely and were never subjected to the same meetings/criticisms as PLAINTIFF.

153.  PLAINTIFF asked DEFENDANT MOTHERSHED why she was being singled out and why her coworkers, who clearly wore form-fitting clothing and short skirts, were not being reprimanded about their manner of dress.

154.  DEFENDANT MOTHERSHED had no answer. But, he then mentioned a link that referenced DELIOTTE'S dress code and emailed the links to PLAINTIFF.

155.  DEFENDANT MOTHERSHED did not subject PLAINTIFF'S similarly-situated coworkers to the same actions.

156.  Again, PLAINTIFF was caused to be, and feel, unfairly singled-out.

157.  On July 10, 2018, PLAINTIFF reported to DEFENDANT MOTHERSHED'S office because she had a scheduled routine bi-weekly meeting with DEFENDANT MOTHERSHED.

158.  However, for this meeting, a member of Human Resources (Laura) was present.

159.  At that time, DEFENDANT MOTHERSHED told PLAINTIFF that DELOITTE decide to separate her from the firm and that PLAINTIFF will no longer be working there.

160.  PLAINTIFF was told that she as being terminated on this day 7/10/2018.

161.  PLAINTIFF was shocked that she was being terminated.

162.  PLAINTIFF asked DEFENDANT MOTHERSHED for the reason for the termination.

163. Surprisingly, DEFENDANT MOTHERSHED said "*we have gone through this many times*" and that PLAINTIFF was being terminated due to her alleged "*dress code*" violations and that PLAINTIFF "*was not teaming well with the team*."

164. DEFENDANT MOTHERSHED claimed that "*there have been improvements, but it was still not enough.*"

165. DEFENDANT MOTHERSHED'S reasons for terminating PLAINTIFF were discriminatory, retaliatory and pretextual.

166. PLAINTIFF was extra-careful to not wear clothing that violated the policy - especially in light of DEFENDANT MOTHERSHED'S constant criticisms.

167. Further, DEFENDANT MOTHERSHED, as well as DEFENDANT DELOITTE and its Human Resources department knew that PLAINTIFF continued to complain that her issues with her coworkers (including MOTHERSHED) were due to her disabilities.

168. Indeed, any and all issues that PLAINTIFF had with her coworkers involved PLAINTIFF'S hearing impairment and PLAINTIFF constantly complained to human resources about her coworkers' unfair treatment as a result of her disabilities.

169. COLLECTIVE DEFENDANTS were also aware of PLAINTIFF'S continued attempts to explain her disabilities to her coworkers/team and educate them about her condition to eliminate misunderstandings.

170. Nevertheless, DEFENDANT MOTHERSHED and DELOITTE took no good faith action to resolve or abate these issues.

171. Instead, they allowed the discriminatory and hostile work environment against PLAINTIFF to continue without recourse or any good faith attempt to remedy same.

172. Instead of remedying the issues about which PLAINTIFF complained, COLLECTIVE DEFENDANTS sought to get rid of PLAINTIFF instead.

173.   PLAINTIFF was then escorted to her office, ordered to pack up her belongings and was ten embarrassingly removed from the premises.

174.   PLAINTIFF was terminated for engaging in protected activity and for continuing to request reasonable accommodations during the months prior to her termination.

175.   DEFENDANTS never engaged in a good faith interactive process with PLAINTIFF nor did they attempt to accommodate her requests.

176.   Instead, DEFENDANTS wrongfully terminated PLAINTIFF.

177.   While employed at DELIOTTE, PLAINTIFF was exposed to a hostile work environment that was permeated with discriminatory ridicule, insults, humiliation, scrutiny, unequal treatment, adverse employment actions, and other abusive conduct by DEFENDANT MOTHERSHED and the members of his team.

178.   The hostile work environment to which PLAINTIFF was subjected made it difficult for PLAINTIFF to perform the duties of her employment and made the workplace intolerable.

179.   **DEFENDANTS' ongoing and systematic harassment of/against PLAINTIFF over the course of months was a <u>continuing violation</u> of PLAINTIFF'S rights.**

180.   COLLECTIVE DEFENDANTS treated PLAINTIFF this way solely due to her disability and due to her request(s) for reasonable accommodations.

181.   COLLECTIVE DEFENDANTS acted intentionally and intended to harm PLAINTIFF.

182.   COLLECTIVE DEFENDANTS unlawfully discriminated against, retaliated against, humiliated, degraded, and belittled PLAINTIFF. As a result, PLAINTIFF suffers loss of rights, emotional distress, and loss of income.

183.   As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of employment, financial hardship, loss of income, the loss of a salary, loss of bonus, loss of employment benefits, loss of retirement benefits, stress, humiliation, pain and suffering,

major inconvenience, other compensation which such employment entails, special damages, and great inconvenience.

184.    PLAINTIFF has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

185.    COLLECTIVE DEFENDANTS acted maliciously, willfully, outrageously, and with full knowledge of the law. As such, PLAINTIFF demands punitive damages as against COLLECTIVE DEFENDANTS, jointly and severally.

**FIRST CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER THE AMERICANS WITH DISABILITIES ACT**
*(Against Defendant DELOITTE)*

186.    PLAINTIFF repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

187.    Section 12112 of the ADA, titled "Discrimination," provides:

> "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

188.    Defendant DELOITTE violated this section as set forth herein.

189.    At all times, PLAINTIFF suffered from a disability and/or DELOITTE DEFENDANTS' perceived that PLAINTIFF was suffering from a disability.

190.    PLAINTIFF disclosed her disability to DEFENDANTS and asked, specifically, for a "*reasonable accommodation*" both in writing and also verbally.

191.    PLAINTIFF clearly sought to continue to work with reasonable accommodations.

192.    DEFENDANTS could have easily granted PLAINTIFF accommodations, could have explained PLAINTIFF'S conditions and needs to her coworkers, could have explained the ADA and its obligations to her coworkers and/or could have improved PLAINTIFF'S work

environment.

193.   However, DEFENDANTS intentionally refused/failed to do so.

194.   DEFENDANTS' failure/refusal to grant PLAINTIFF reasonable accommodations was in furtherance of their attempt to remove PLAINTIFF from her employment, for discriminatory and retaliatory reasons.

195.   DEFENDANTS did not engage in any good faith interactive process for PLAINTIFF, nor did they consider any aspect of PLAINTIFF recommendations as to what accommodations would allow her to do her job.

196.   In the alternative, DEFENDANTS never attempted to determine if there were ways to accommodate PLAINTIFF and/or to hep PLAINTIFF interact better with her team.

197.   DEFENDANTS intended, instead, to subject PLAINTIFF to a hostile work environment and to remove PLAINTIFF from her employment.

198.   DEFENDANTS discriminated and retaliated against PLAINTIFF due to her disability and for engaging in protected activity.

199.   COLLECTIVE DEFENDANTS had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

200.   As a result of COLLECTIVE DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

201.   As a result of the acts and conduct complained of herein, PLAINTIFF suffered, and continues to suffer, stress, ongoing humiliation, intimidation, ridicule, fear, anxiety, wrongful disciplinary action, loss of income, the loss of a salary, special damages, loss of employment, loss of benefits, and loss of other compensation which such employment entails, and PLAINTIFF also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

202.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

203.   PLAINTIFF is entitled to the maximum damages allowable under this law, including attorney's fees and costs.

## SECOND CAUSE OF ACTION FOR RETALIATION
## UNDER THE AMERICANS WITH DISABILITIES ACT
### *(Against Defendant DELOITTE)*

204.   PLAINTIFF repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

205.   The ADA prohibits retaliation, interference, coercion, or intimidation.

206.   Section 12203 of the ADA provides:

> a)      Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.
> b)      Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

207.   Defendant DELOITTE violated this section as set forth herein.

208.   At all times, PLAINTIFF suffered from a disability and/or DELOITTE DEFENDANTS' perceived that PLAINTIFF was suffering from a disability.

209.   PLAINTIFF disclosed her disability to DEFENDANTS and asked, specifically, for a "*reasonable accommodation*" both in writing and also verbally.

210.   PLAINTIFF clearly sought to continue to work with reasonable accommodations.

211.   PLAINTIFF continued to complain (protected activity) to DELOITTE, DEFENDANT FOX, as well as to her manager, DEFENDANT MOTHERSHED about the continued

hostile work environment and ongoing discriminatory actions against her.

212. In response, DEFENDANTS took no real action to alleviate PLAINTIFF'S complaints and instead began to accuse PLAINTIFF of violating the dress code policy and not getting along with her team - in an effort to assure that PLAINTIFF would be wrongfully removed from her employment.

213. DEFENDANTS' failure/refusal to grant PLAINTIFF reasonable accommodations was in furtherance of their attempt to retaliate against and remove PLAINTIFF from her employment, for discriminatory reasons.

214. DEFENDANTS did not engage in any good faith interactive process for PLAINTIFF, nor did they consider any aspect of PLAINTIFF recommendations as to what accommodations would allow her to do her job.

215. DEFENDANTS intended, instead, to subject PLAINTIFF to a hostile work environment and to remove PLAINTIFF from her employment.

216. Thereafter, PLAINTIFF was subjected to a hostile work environment that was permeated with ridicule, insult, increased scrutiny, unfair meetings, unreasonable micromanaging, verbal abuse, humiliating behavior, unreasonable critiques, bullying, intentional failure/refusal to grant accommodations while continuing to unreasonably discipline PLAINTIFF.

217. DEFENDANTS discriminated and retaliated against PLAINTIFF due to her disability and for engaging in protected activity by wrongfully terminating PLAINTIFF.

218. COLLECTIVE DEFENDANTS had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

219. As a result of COLLECTIVE DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

220.   As a result of the acts and conduct complained of herein, PLAINTIFF suffered, and continues to suffer, stress, ongoing humiliation, intimidation, ridicule, fear, anxiety, wrongful disciplinary action, loss of income, the loss of a salary, special damages, loss of employment, loss of benefits, and loss of other compensation which such employment entails, and PLAINTIFF also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

221.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

222.   PLAINTIFF is entitled to the maximum damages allowable under this law, including attorney's fees and costs.

### THIRD CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK STATE EXECUTIVE LAW
### *(Against COLLECTIVE DEFENDANTS)*

223.   PLAINTIFF repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

224.   The New York State Executive Law § 296(1)(a) provides in pertinent part:

> "It shall be an unlawful discriminatory practice: For an employer . . . because of an individual's . . . disability . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

225.   Defendant DELOITTE violated this section as set forth herein.

226.   INDIVIDUAL DEFENDANTS MOTHERSHED and FOX are equally liable for **aiding and abetting** the discriminatory conduct of their employer, DELIOTTE, against PLAINTIFF.

227.   At all times, PLAINTIFF suffered from a disability and/or DELOITTE DEFENDANTS' perceived that PLAINTIFF was suffering from a disability.

228. PLAINTIFF disclosed her disability to DEFENDANTS and asked, specifically, for a "*reasonable accommodation*" both in writing and also verbally.

229. PLAINTIFF clearly sought to continue to work with reasonable accommodations.

230. DEFENDANTS could have easily granted PLAINTIFF accommodations, could have explained PLAINTIFF'S conditions and needs to her coworkers, could have explained the ADA and its obligations to her coworkers and/or could have improved PLAINTIFF'S work environment.

231. However, DEFENDANTS intentionally refused/failed to do so.

232. DEFENDANTS' failure/refusal to grant PLAINTIFF reasonable accommodations was in furtherance of their attempt to remove PLAINTIFF from her employment, for discriminatory reasons.

233. DEFENDANTS did not engage in any good faith interactive process for PLAINTIFF, nor did they consider any aspect of PLAINTIFF recommendations as to what accommodations would allow her to do her job.

234. In the alternative, DEFENDANTS never attempted to determine if there were ways to accommodate PLAINTIFF and/or to hep PLAINTIFF interact better with her team.

235. DEFENDANTS intended, instead, to subject PLAINTIFF to a hostile work environment and to remove PLAINTIFF from her employment.

236. DEFENDANTS discriminated and retaliated against PLAINTIFF due to her disability and for engaging in protected activity.

237. COLLECTIVE DEFENDANTS had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

238. As a result of COLLECTIVE DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

239. As a result of the acts and conduct complained of herein, PLAINTIFF suffered, and continues to suffer, stress, ongoing humiliation, intimidation, ridicule, fear, anxiety, wrongful disciplinary action, loss of income, the loss of a salary, special damages, loss of employment, loss of benefits, and loss of other compensation which such employment entails, and PLAINTIFF also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

240. COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

241. PLAINTIFF is entitled to the maximum damages allowable under this law, including attorney's fees and costs.

**FOURTH CAUSE OF ACTIONFOR *RETALIATION*
UNDER THE NEW YORK STATE EXECUTIVE LAW**
*(Against COLLECTIVE DEFENDANTS)*

242. PLAINTIFF repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

243. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "*For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article.*"

244. Defendant DELOITTE violated this section as set forth herein.

245. INDIVIDUAL DEFENDANTS are equally liable for **aiding and abetting** the retaliatory conduct of their employer, DELIOTTE, against PLAINTIFF.

246. At all times, PLAINTIFF suffered from a disability and/or DELOITTE DEFENDANTS' perceived that PLAINTIFF was suffering from a disability.

247. PLAINTIFF disclosed her disability to DEFENDANTS and asked, specifically, for a

"*reasonable accommodation*" both in writing and also verbally.

248.    PLAINTIFF clearly sought to continue to work with reasonable accommodations.

249.    PLAINTIFF continued to complain (protected activity) to DELOITTE, DEFENDANT FOX, as well as to her manager, DEFENDANT MOTHERSHED about the continued hostile work environment and ongoing discriminatory actions against her.

250.    In response, DEFENDANT took no real action to alleviate PLAINTIFF'S complaints and instead began to accuse PLAINTIFF of violating the dress code policy and not getting along with her team - in an effort to assure that PLAINTIFF would be wrongfully removed from her employment.

251.     DEFENDANTS' failure/refusal to grant PLAINTIFF reasonable accommodations was in furtherance of their attempt to retaliate against and remove PLAINTIFF from her employment, for discriminatory reasons.

252.    DEFENDANTS did not engage in any good faith interactive process for PLAINTIFF, nor did they consider any aspect of PLAINTIFF recommendations as to what accommodations would allow her to do her job.

253.    DEFENDANTS intended, instead, to subject PLAINTIFF to a hostile work environment and to remove PLAINTIFF from her employment.

254.    Thereafter, PLAINTIFF was subjected to a hostile work environment permeated with ridicule, insult, increased scrutiny, unfair meetings, unreasonable micromanaging, verbal abuse, humiliating behavior, unreasonable critiques, bullying, intentional failure/refusal to grant accommodations while continuing to unreasonably discipline PLAINTIFF.

255.    DEFENDANTS discriminated and retaliated against PLAINTIFF due to her disability and for engaging in protected activity by wrongfully terminating PLAINTIFF.

256.    COLLECTIVE DEFENDANTS had no good faith business justification for any of the

actions taken against PLAINTIFF as alleged herein.

257.   As a result of COLLECTIVE DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

258.   As a result of the acts and conduct complained of herein, PLAINTIFF suffered, and continues to suffer, stress, ongoing humiliation, intimidation, ridicule, fear, anxiety, wrongful disciplinary action, loss of income, the loss of a salary, special damages, loss of employment, loss of benefits, and loss of other compensation which such employment entails, and PLAINTIFF also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

259.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

260.   PLAINTIFF is entitled to the maximum damages allowable under this law, including attorney's fees and costs.

### FIFTH CAUSE OF ACTION FOR *DISCRIMINATION* UNDER NEW YORK STATE EXECUTIVE LAW
### *(Against Individual Defendants MOTHERSHED and FOX)*

261.   PLAINTIFF repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

262.   New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "*For any person to **aid, abet,** incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so.*"

263.   Individual Defendants JESSE MOTHERSHED and ALEXIS FOX violated this section as set forth herein.

264.   Individual DEFENDANTS MOTHERSHED and FOX personally participated in the actions at issue in this Complaint.

265. At all times, PLAINTIFF suffered from a disability and/or DELOITTE DEFENDANTS perceived that PLAINTIFF was suffering from a disability.

266. PLAINTIFF could have worked with reasonable accommodations.

267. PLAINTIFF sought to continue to work with reasonable accommodations.

268. DEFENDANT MOTHERSHED could have easily granted PLAINTIFF accommodations and could have allowed PLAINTIFF to try to work therewith. However, DEFENDANT MOTHERSHED intentionally refused/failed to do so.

269. DEFENDANT MOTHERSHED'S failure/refusal to grant PLAINTIFF reasonable accommodations were in furtherance of DELOITTE'S attempt to remove PLAINTIFF from her employment, for discriminatory reasons.

270. DEFENDANT MOTHERSHED acting on behalf of DELOITTE, did not engage in any good faith interactive process for PLAINTIFF, nor did they consider any aspect of PLAINTIFF'S recommendations.

271. In the alternative, DEFENDANT MOTHERSHED never attempted to determine if there were alternate ways than those suggested by PLAINTIFF, to determine if PLAINTIFF could acclimate herself to her environment and/or to accommodate PLAINTIFF.

272. DEFENDANT MOTHERSHED knew that PLAINTIFF'S disabilities were causing issues between PLAINTIFF and her team, but took no action to abate the situation, to inform PLAINTIFF'S team (Mothershed's subordinates) about their obligations to accommodate PLAINTIFF under the ADA or to determine if PLAINTIFF could be accommodated in any way.

273. DEFENDANT MOTHERSHED then discriminated and retaliated against PLAINTIFF due to her (actual or perceived) disability and for engaging in protected activity.

274. PLAINTIFF complained to DEFENDANT FOX on multiple occasions to no avail.

275. DEFENDANT FOX took no action in response to PLAINTIFFF'S complaints and allowed the retaliatory a discriminatory hostile work environment to continue against PLAINTIFF.

276. At all times, DEFENDANTS MOTHERSHED and FOX were each acting within the scope of their employments and under the authorities given to them by thier employer DEFENDANT DELOITTE.

277. But for DEFENDANT MOTHERSHED'S management position, DEFENDANT MOTHERSHED would not have been able to subject PLAINTIFF to the discriminatory and retaliatory treatment alleged herein.

278. DEFENDANTS MOTHERSHED and FOX had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

279. As a result of DEFENDANTS' MOTHERSHED'S and FOX'S actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

280. As a result of the acts and conduct complained of herein, PLAINTIFF suffered, and continues to suffer, stress, ongoing humiliation, intimidation, ridicule, fear, anxiety, wrongful disciplinary action, loss of income, the loss of a salary, unequal pay, special damages, loss of employment, loss of benefits, and loss of other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

281. DEFENDANTS' MOTHERSHED'S and FOX'S conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

282. PLAINTIFF is entitled to the maximum damages allowable under this law, including attorney's fees and costs.

**SIXTH CAUSE OF ACTION FOR *DISCRIMINATION*
UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
*(Against Collective Defendants)*

283. PLAINTIFF repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

284. The New York City Administrative Code §8-107(1) provides:

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived . . . disability . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

285. Defendant DELOITTE violated this section as set forth herein.

286. At all times, PLAINTIFF suffered from a disability and/or DELOITTE DEFENDANTS' perceived that PLAINTIFF was suffering from a disability.

287. PLAINTIFF disclosed her disability to DEFENDANTS and asked, specifically, for a "*reasonable accommodation*" both in writing and also verbally.

288. PLAINTIFF clearly sought to continue to work with reasonable accommodations.

289. DEFENDANTS could have easily granted PLAINTIFF accommodations, could have explained PLAINTIFF'S conditions and needs to her coworkers, could have explained the ADA and its obligations to her coworkers and/or could have improved PLAINTIFF'S work environment.

290. However, DEFENDANTS intentionally refused/failed to do so.

291. DEFENDANTS' failure/refusal to grant PLAINTIFF reasonable accommodations was in furtherance of their attempt to remove PLAINTIFF from her employment, for discriminatory reasons.

292. DEFENDANTS did not engage in any good faith interactive process for PLAINTIFF, nor did they consider any aspect of PLAINTIFF recommendations as to what accommodations

would allow her to do her job.

293.   In the alternative, DEFENDANTS never attempted to determine if there were ways to accommodate PLAINTIFF and/or to hep PLAINTIFF interact better with her team.

294.   DEFENDANTS intended, instead, to remove PLAINTIFF from her employment.

295.   DEFENDANTS discriminated and retaliated against PLAINTIFF due to her disability and for engaging in protected activity.

296.   COLLECTIVE DEFENDANTS had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

297.   As a result of COLLECTIVE DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

298.   As a result of the acts and conduct complained of herein, PLAINTIFF suffered, and continues to suffer, stress, ongoing humiliation, intimidation, ridicule, fear, anxiety, wrongful disciplinary action, loss of income, the loss of a salary, special damages, loss of employment, loss of benefits, and loss of other compensation which such employment entails, and PLAINTIFF also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

299.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

300.   PLAINTIFF is entitled to the maximum damages allowable under this law, including attorney's fees and costs.

### SEVENTH CAUSE OF ACTION FOR *DISCRIMINATION* UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
*(Against Individual Defendants MOTHERSHED and FOX)*

301.   PLAINTIFF repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

302.   The <u>New York City Administrative Code</u> § 8-107(6) provides that it shall be unlawful

discriminatory practice: "*For any person to **aid, abet,** incite, compel; or coerce the doing*

*of any of the acts forbidden under this chapter, or attempt to do so*."

303.   Individual Defendants JESSE MOTHERSHED and ALEXIS FOX violated this section as

set forth herein.

304.   Individual DEFENDANTS MOTHERSHED and FOX personally participated in the

actions at issue in this Complaint.

305.   At all times, PLAINTIFF suffered from a disability and/or DELOITTE DEFENDANTS

perceived that PLAINTIFF was suffering from a disability.

306.   PLAINTIFF could have worked with reasonable accommodations.

307.   PLAINTIFF sought to continue to work with reasonable accommodations.

308.   DEFENDANT MOTHERSHED could have easily granted PLAINTIFF accommodations

and could have allowed PLAINTIFF to try to work therewith. However, DEFENDANT

MOTHERSHED intentionally refused/failed to do so.

309.    DEFENDANT MOTHERSHED'S failure/refusal to grant PLAINTIFF reasonable

accommodations were in furtherance of DELOITTE'S attempt to remove PLAINTIFF

from her employment, for discriminatory reasons.

310.   DEFENDANT MOTHERSHED acting on behalf of DELOITTE, did not engage in any

good faith interactive process for PLAINTIFF, nor did they consider any aspect of

PLAINTIFF'S recommendations.

311.   In the alternative, DEFENDANT MOTHERSHED never attempted to determine if there

were alternate ways than those suggested by PLAINTIFF, to determine if PLAINTIFF

could acclimate herself to her environment and/or to accommodate PLAINTIFF.

312.   DEFENDANT MOTHERSHED knew that PLAINTIFF'S disabilities were causing issues

between PLAINTIFF and her team, but took no action to abate the situation, to inform PLAINTIFF'S team (Mothershed's subordinates) about their obligations to accommodate PLAINTIFF under the ADA or to determine if PLAINTIFF could be accommodated in any way.

313.   DEFENDANT MOTHERSHED then discriminated and retaliated against PLAINTIFF due to her (actual or perceived) disability and for engaging in protected activity.

314.   PLAINTIFF complained to DEFENDANT FOX on multiple occasions to no avail.

315.   DEFENDANT FOX took no action in response to PLAINTIFFF'S complaints and allowed the retaliatory a discriminatory hostile work environment to continue against PLAINTIFF.

316.   At all times, DEFENDANTS MOTHERSHED and FOX were each acting within the scope of their employments and under the authorities given to them by thier employer DEFENDANT DELOITTE.

317.   But for DEFENDANT MOTHERSHED'S management position, DEFENDANT MOTHERSHED would not have been able to subject PLAINTIFF to the discriminatory and retaliatory treatment alleged herein.

318.   DEFENDANTS MOTHERSHED and FOX had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

319.   As a result of DEFENDANTS' MOTHERSHED'S and FOX'S actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

320.   As a result of the acts and conduct complained of herein, PLAINTIFF suffered, and continues to suffer, stress, ongoing humiliation, intimidation, ridicule, fear, anxiety, wrongful disciplinary action, loss of income, the loss of a salary, unequal pay, special damages, loss of employment, loss of benefits, and loss of other compensation which such

employment entails, and PLAINTIFF has also suffered future pecuniary losses, emotional

pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

321.    DEFENDANTS' MOTHERSHED'S and FOX'S conduct was malicious, willful,

outrageous, and conducted with full knowledge of the law.

322.    PLAINTIFF is entitled to the maximum damages allowable under this law, including

attorney's fees and costs.

### EIGHTH CAUSE OF ACTION FOR *RETALIATION* UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
*(Against Collective Defendants)*

323.    PLAINTIFF repeats and realleges each and every allegation made in the above paragraphs

of this Complaint.

324.    The New York City Administrative Code § 8-107(7) provides that it shall be unlawful

discriminatory practice: "For an employer . . . to discriminate against any person because

such person has opposed any practices forbidden under this chapter."

325.    Defendant DELOITTE violated this section as set forth herein.

326.    At all times, PLAINTIFF suffered from a disability and/or DELOITTE DEFENDANTS'

perceived that PLAINTIFF was suffering from a disability.

327.    PLAINTIFF disclosed her disability to DEFENDANTS and asked, specifically, for a

"*reasonable accommodation*" both in writing and also verbally.

328.    PLAINTIFF clearly sought to continue to work with reasonable accommodations.

329.    PLAINTIFF continued to complain (protected activity) to DELOITTE, as well as to her

manager, DEFENDANT MOTHERSHED about the continued hostile work environment

and ongoing discriminatory actions against her.

330.    In response, DEFENDANT took no real action to alleviate PLAINTIFF'S complaints and

instead began to accuse PLAINTIFF of violating the dress code policy and not getting

along with her team - in an effort to assure that PLAINTIFF would be wrongfully removed from her employment.

331.  DEFENDANTS' failure/refusal to grant PLAINTIFF reasonable accommodations was in furtherance of their attempt to retaliate against and remove PLAINTIFF from her employment, for discriminatory reasons.

332.  DEFENDANTS did not engage in any good faith interactive process for PLAINTIFF, nor did they consider any aspect of PLAINTIFF recommendations as to what accommodations would allow her to do her job.

333.  DEFENDANTS intended, instead, to remove PLAINTIFF from her employment.

334.  Thereafter, PLAINTIFF was subjected to a hostile work environment permeated with ridicule, insult, increased scrutiny, unfair meetings, unreasonable micromanaging, verbal abuse, humiliating behavior, unreasonable critiques, bullying, intentional failure/refusal to grant accommodations while continuing to unreasonably discipline PLAINTIFF.

335.  DEFENDANTS discriminated and retaliated against PLAINTIFF due to her disability and for engaging in protected activity by wrongfully terminating PLAINTIFF.

336.  COLLECTIVE DEFENDANTS had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

337.  As a result of COLLECTIVE DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

338.  As a result of the acts and conduct complained of herein, PLAINTIFF suffered, and continues to suffer, stress, ongoing humiliation, intimidation, ridicule, fear, anxiety, wrongful disciplinary action, loss of income, the loss of a salary, special damages, loss of employment, loss of benefits, and loss of other compensation which such employment

entails, and PLAINTIFF also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

339.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

340.   PLAINTIFF is entitled to the maximum damages allowable under this law, including attorney's fees and costs.

## NINTH CAUSE OF ACTION FOR *DISCRIMINATION* VICARIOUS LIABILITY UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### (*Against Defendant DELOITTE*)

341.   PLAINTIFF repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

342.   <u>NYCHRL</u> § 8-107(13) is entitled "Employer liability for discriminatory conduct by an employee, agent or independent contractor." It provides

> a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.
> b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where: (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.
> c. An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and

acquiesced in such conduct.

343. Defendant DELOITTE violated this section as set forth herein and is vicarious liable for the conduct of its managers and employees, DEFENDANTS MOTHERSHED and FOX.

344. At all times, Individual DEFENDANTS MOTHERSHED and FOX were acting pursuant to their authorities and employments at DELOITTE.

345. But for Individual DEFENDANTS' MOTHERSED'S and FOXS positions, DEFENDANT MOTHERSHED would not have been able to subject PLAINTIFF to the discriminatory and retaliatory treatment alleged above and DEFENDANT FOX would not have allowed DEFENDANT MOTHERSHED to continue to abuse PLAINTIFF.

346. At all times, DEFENDANT DELOITTE knew or should have known that its employee, DEFENDANT MOTHERSHED was violating PLAINTIFF'S rights and attempting to unlawfully remove PLAINTIFF from employment.

347. DEFENDANTS DELOITTE and FOX took no action to prevent DEFENDANT MOTHERSHED, but instead condoned, supported and failed to act in response to DEFENDANT MOTHERSHED'S known discriminatory acts against PLAINTIFF.

348. COLLECTIVE DEFENDANTS had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

349. As a result of COLLECTIVE DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

350. As a result of the acts and conduct complained of herein, PLAINTIFF suffered, and continues to suffer, stress, ongoing humiliation, intimidation, ridicule, fear, anxiety, wrongful disciplinary action, loss of income, the loss of a salary, unequal pay, special damages, loss of employment, loss of benefits, and loss of other compensation which such

employment entails, and PLAINTIFF has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

351.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

352.   PLAINTIFF is entitled to the maximum damages allowable under this law, including attorney's fees and costs.

## PUNITIVE DAMAGES ARE APPROPRIATE HEREIN

353.   Collective DEFENDANTS' conduct was willful, malicious, intentional and intended to humiliate and abuse PLAINTIFF due to her disabilities. As such Punitive damages are appropriate against DEFENDANTS, collectively and individually, for their actions as alleged above.

## JURY DEMAND

354.   PLAINTIFF requests a jury trial on all issues to be tried.

**WHEREFORE**, PLAINTIFF respectfully requests a judgment against Defendants:

A.   Declaring that Defendants engaged in unlawful employment practices prohibited by the ADA, NYSHRL, and NYCHRL, in that Defendants discriminated against PLAINTIFF on the basis of her actual and/or perceived disability; retaliated against PLAINTIFF for engaging in protected activity and unlawfully terminated PLAINTIFF;

B.   Awarding damages to PLAINTIFF for all lost wages and benefits resulting from Collective Defendants' unlawful discrimination and conduct and to otherwise make her whole for any losses suffered because of such unlawful employment practices;

C.   Awarding PLAINTIFF compensatory damages for mental and emotional injury, distress, pain, suffering, and injury to his reputation in an amount to be proven;

D.   Awarding PLAINTIFF punitive damages;

E.   Awarding PLAINTIFF attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F.   Awarding PLAINTIFF such other and further relief as the Court may deem equitable, just, and proper to remedy Collective Defendants' unlawful employment practices.

Dated:  New York, New York
        May 31, 2019

**PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC**

By:  */S/*
     _____
     Gregory Calliste, Jr.
     Siobhan Klassen
     *Attorneys for Plaintiff*
     45 Broadway, Suite 620
     New York, New York 10006
     (212) 248-7431
     gcalliste@tpglaws.com
     sklassen@tpglaws.com